FILED
CLERK, U.S. DISTRICT COURT
9/29/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: KMA DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2026 Grand Jury

UNITED STATES OF AMERICA,

Plaintiff,

v.

GREG LUI,
aka "Yiu Kong Lui,"

Defendant.

CR 2:26-cr-00618-ODW

I N D I C T M E N T

[50 U.S.C. § 4819(a) and (b); 15 C.F.R. §§ 736.2(b)(1), 764.2, and Part 774, Supp. No. 1: Conspiracy to Violate the Export Control Reform Act and the Export Administration Regulations; 18 U.S.C. § 554: Outbound Smuggling; 18 U.S.C. § 1956(h): Money Laundering Conspiracy; 50 U.S.C. § 4819(d)(1); 18 U.S.C. §§ 981(a)(1)(C), 982; and 28 U.S.C. § 2461(c): Criminal Forfeiture]

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1. Beginning in 2024, defendant Greg Lui, also known as "Yiu Kong Lui" ("defendant"), and others, conspired to illegally smuggle over 300 million dollars' worth of high-end computer servers, commonly used for artificial intelligence applications, to the People's Republic of China ("China"). Defendant executed this scheme

knowing that government regulations barred the export of such high-end technology to China to protect the national security and foreign policy interests of the United States.

2. As part of defendant's scheme, defendant procured the high-end computer servers, containing graphics processing units manufactured by Nvidia Corporation ("Nvidia"), from several U.S. manufactures by falsely claiming that the end users of the servers were located in countries that did not require export licenses from the United States Department of Commerce, despite knowing that the true end users of the servers were located in China.

I. Background of the Defendant and his Company

3. Earthmade Computer Inc. ("Earthmade") was a closely held corporation located in City of Industry, California, that was established on or about November 10, 2023. Coindigger was a closely held corporation also located in City of Industry, California, that did business as Earthmade.

4. Topmost Corp ("Topmost") was a closely held corporation located in the City of Industry, California, that was established on February 24, 2024.

5. U.S. Front Company was a corporation located in the United States that was used by defendant to purchase export-controlled servers.

6. Malaysian Transshipment Company 1 was a corporation located in Malaysia, that was established on or about October 22, 1999, and primarily focused on the lumber, plywood, millwork, and wood panel industries.

7. Malaysian Transshipment Company 2 was a front company located in Malaysia.

8. U.S. Manufacturer 1, U.S. Manufacturer 2, and U.S. Manufacturer 3, were high-end U.S. technology companies that designed and built high-performance computer servers for artificial intelligence and cloud computing applications.

9. U.S. Freight Forwarder 1 was an international shipper that coordinated the transportation of goods for Earthmade from U.S. Manufacturers 1, 2, and 3.

10. U.S. Freight Forwarder 2 was another international shipper that coordinated the transportation of goods for Earthmade from U.S. Manufacturers 1 and 2.

11. Chinese Purchaser was a Chinese industrial company based in Hangzhou, China.

12. Defendant Greg Lui ("LUI") was the Chief Executive Officer and Registered Agent of Earthmade and Coindigger, which did business as Earthmade.

13. Unindicted Co-Conspirator 1 was a sales manager at U.S. Manufacturer 1 and approved the sale of high-end technology to Earthmade.

14. Unindicted Co-Conspirator 2 was the Chief Executive Officer of Malaysian Transshipment Company 1.

15. Unindicted Co-Conspirator 3 was an office manager for Earthmade and signatory on the bank accounts for Topmost.

16. Unindicted Co-Conspirator 4 was the purported Chief Technology Officer for Malaysian Transshipment Company 1 but in reality was an international broker of export-controlled servers and the incorporator of Topmost.

17. Unindicted Co-Conspirator 5 was an executive at U.S. Freight Forwarder 1.

18. Together, defendant, Unindicted Co-Conspirators 1 through 5, and others known and unknown to the grand jury, orchestrated a scheme to purchase export-controlled servers from the U.S. Manufacturers and ship them to China through the Malaysian Transsshipments Companies 1 and 2.

II. Relevant Statutory and Regulatory Background

19. The Export Control Reform Act ("ECRA") provides, among other things, that the national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items be controlled, 50 U.S.C. § 4811, and grants the President the authority to control such activities, 50 U.S.C. § 4812. ECRA further grants to the Secretary of Commerce the authority to establish the applicable regulatory framework. 50 U.S.C. § 4813.

20. The Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774, restrict the export of items for national security, foreign policy, and other interests of the United States, as reflected in international obligations and arrangements. 15 C.F.R. § 730.6. The EAR restrict exports of dual use items that could make significant contributions to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. Id. § 742.4. The EAR impose licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully reexported from one foreign destination to another. Id. § 730.7.

21. The most sensitive dual use items subject to EAR controls are identified on the Commerce Control List ("CCL"), published at Title 15, Code of Federal Regulations, Part 774, Supplement Number 1. Items on the CCL are categorized by an Export Control Classification

Number ("ECCN") based on their technical characteristics. Each ECCN has export control requirements depending on the destination, end user, and end use.

22. Beginning on or around October 7, 2022, the United States Department of Commerce Bureau of Industry and Security ("BIS") began amending the EAR to implement new controls on advanced computing integrated circuits ("ICs"), computer commodities that contain ICs, and certain semiconductor manufacturing items. See 15 C.F.R. § 744.23; 87 Fed. Reg. 62186. In addition, BIS imposed additional export controls on certain advanced computing semiconductor chips (e.g., chips, advanced computing chips, and ICs), transactions for supercomputer end-uses, and transactions involving certain entities on the Entity List.[1] These restrictions applied to high-performance ICs that are useful in data center processing and artificial intelligence. The restrictions applied to China (including Hong Kong).[2] On or about October 25, 2023, BIS released two interim final rules (effective on November 17, 2023) that expanded export controls related to advanced computing and semiconductors and were aimed at China and other countries of national security concern.

23. Items that fall within the scope of the EAR but are not specifically controlled for export are given the classification "EAR99." EAR99 items generally consist of low-technology consumer goods and do not require a license in most situations.

---

[1] The Entity List, located at Supplement No. 4 to Part 744 of the EAR, contains a list of names of certain foreign persons – including businesses, research institutions, government and private organizations, individuals, and other types of legal persons – that are subject to specific license requirements for the export, reexport and or transfer of specific items subject to the EAR.

[2] Under the EAR, Hong Kong is generally treated as any other city in mainland China. See E.O. 13936.

24. NVIDIA A100 Graphics Processing Units ("GPUs"), H100 GPUs, PNY GE Force RTX 4090 GPUs, and GeForce RTX 5090 GPUs are all classified under ECCN 4A090.a. Items classified under ECCNs 4A090.a, 5A002.z, and 5A992.z are controlled for regional stability reasons and require a license for export to China, among other places. See 15 C.F.R. § 742.6(a)(6).

25. At no time did defendant or his company Earthmade apply for, receive, or possess a license from BIS to export or reexport any items classified under ECCNs 4A090.a, 5A002.z, 5A992.z, or any other ECCN to China (including Hong Kong) or any other place.

III. Export and Shipping Records

26. Pursuant to U.S. law and regulations, exporters or their authorized agents, such as shippers or freight forwarders, are required to file certain forms and declarations concerning the export of goods and technology from the United States. Typically, those documents are filed electronically through the Automated Export System ("AES"), which is administered by the U.S. Department of Homeland Security, Customs, and Border Protection ("CBP").

27. The Electronic Export Information ("EEI") (formerly known as the Shipper's Export Declaration) is the required documentation submitted to the U.S. Government through the AES in connection with an export shipment from the United States. Exporters or their authorized agents are required to file an accurate and truthful EEI for every export of goods from the United States with a value of $2,500 or more. If the goods require an export license, then filing an EEI is required regardless of the value of the goods. 15 C.F.R. §§ 30.2, 758.1.

28. The purpose of these requirements is to strengthen the U.S. Government's ability to prevent the export of certain items to unauthorized destinations and end users. The EEI and AES aid in targeting, identifying, and when necessary, confiscating suspicious or illegal shipments prior to export. 15 C.F.R. § 30.1(b).

29. In addition, the BIS-711 Form, titled "Statement by Ultimate Consignee[3] and Purchaser," is a form submitted to the Department of Commerce by exporters, shippers, and freight forwarders that requires the identification of the end user and end use of goods to be exported from the United States. See 15 C.F.R. § 748.11. The BIS-711 Form seeks assurances from the ultimate consignee and purchaser that the items will not be misused, transferred, or reexported in violation of the EAR. The BIS-711 Form requires the ultimate consignee and purchaser to certify, among other things, that all of the facts contained in the form are true and correct and to acknowledge that the making of any false statements or concealment of any material fact in connection with the form may result in imprisonment or fine, or both, and denial, in whole or in part, of participation in U.S. exports and reexports.

30. A material part of the EEI and AES, as well as other export filings, including the BIS-711 Form, is information concerning the end user and ultimate destination of the export. The identity of the end user may determine whether the goods: (a) may be exported without any specific authorization or license from the U.S. Government;

[3] An ultimate consignee is defined in Title 15, Code of Federal Regulations, Part 748.5(e) as "the principal party in interest located abroad who receives the exported or reexported items. The ultimate consignee is not a forwarding agent or other intermediary, but may be the end-user."

(b) may be exported with the specific authorization or license from the U.S. Government; or (c) may not be exported from the United States.

IV. Overview of the Criminal Scheme

31. Beginning on an unknown date but not later than in or around October 2023, and continuing until at least August 12, 2026, defendant and Unindicted Co-Conspirators 1-5 conspired with each other and persons known and unknown to the Grand Jury to procure sensitive export-controlled items, classified under ECCNs 4A090.a, 5A002.z, or 5A992.z, including advanced computing semiconductor chips (or GPUs) and servers, and then illegally export those controlled items to China.

32. As part of the scheme, defendant, and his co-conspirators, procured hundreds of millions of dollars' worth of export-controlled chips and high-end computer servers from U.S. Manufacturers 1, 2, and 3 and caused them to be exported to China without the required licenses from the United States Department of Commerce, primarily by shipping the export-controlled items through Malaysia and Singapore.

33. Defendant placed orders for export-controlled servers containing NVIDIA A100 GPUs, H100 GPUs, PNY GE Force RTX 4090 GPUs, and GeForce RTX 5090 GPUs from U.S. Manufacturers 1, 2, and 3.

34. After placing these orders, defendant would then employ various freight forwarding companies, including U.S. Freight Forwarders 1 and 2, to ship the export-controlled servers purchased from U.S. Manufactures 1 and 2 to countries such as Malaysia and Singapore that did not require a license from the United States Department of Commerce. However, once the servers arrived in Singapore or Malaysia, the servers were then transshipped to China

in violation of United States export controls. In coordinating these shipments, defendant conspired with Unindicted Co-Conspirator 5 to effectuate the scheme.

35. Between January to October of 2024, Earthmade received over $80 million dollars from the Malaysian Transshipment Company 1 and $96 million dollars from Malaysian Transshipment Company 2.

36. In return, Earthmade, through defendant, introduced the Malaysian Transshipment Companies to U.S. Manufacturer 1 and 2 and brokered the sale of almost three hundred million dollars' worth of export-controlled servers containing Nvidia GPUs from U.S. Manufacturers 1, 2, and 3.

*Earthmade Purchased Almost $8 Million Dollars of Export-Controlled Servers that were shipped to Malaysian Transshipment Company 1 in January of 2024*

37. On January 11, 2024, defendant emailed Unindicted Co-Conspirator 4 indicating that Malaysia Transshipment Company 1 wished to purchase 70 H100 servers. In that email correspondence, defendant attached export compliance forms which indicated that the Malaysian Transshipment Company 1 was aware of U.S. export laws that restricted the sale, transshipment, or export of the Nvidia A100, A8000, H8000, or other advanced integrated circuits to China.

38. On January 30, 2024, defendant submitted a purchase order to U.S. Manufacturer 2 for 27 servers containing Nvidia H100 GPUs for approximately $7,614,000.

39. On January 31, 2024, defendant and Unindicted Co-Conspirator 2 caused 27 servers to be shipped from Los Angeles County to Kuala Lumpur, Malaysia, using U.S. Freight Forwarder 2 to Malaysian Transshipment Company 1. The packing list for this shipment indicated that the shipment contained 27 servers with H100

Nvidia GPUs which at the time were export-controlled and could not be sent to China without a license.

40. On March 12, 2024, Unindicted Co-Conspirator 2 emailed a Malaysian Government Official that the 27 servers with H100 Nvidia GPUs had, in fact, been transshipped to the Chinese Purchaser.

*Earthmade Purchased $13 Million Dollars of Export-Controlled Servers that were sent to Malaysian Transshipment Company 2 in June of 2024*

41. On April 30, 2024, Unindicted Co-Conspirator 1 sent an email to defendant with a quotation for 512 export-controlled servers for Earthmade.

42. On May 1, 2024, defendant sent an email to U.S. Manufacturer 1, Unindicted Co-Conspirator 1, and others placing an order for the export-controlled servers mentioned in Unindicted Co-Conspirator 1's April 30, 2024 email under Purchase Order PO05012024001 (the "24001 PO").

43. On June 12, 2024, an employee of U.S. Manufacturer 1 emailed defendant, Unindicted Co-Conspirator 1, and Unindicted Co-Conspirator 5 that 92 servers from the 24001 PO were ready to ship on June 14, 2024, to Earthmade in Los Angeles County.

44. However, on June 15, 2024, defendant and Unindicted Co-Conspirator 5, caused these 92 export-controlled servers to be sent from San Francisco International Airport to Kuala Lumpur, Malaysia on Singapore Airlines Flight Number SQ0033. Once in Malaysia, the 92 servers were sent from Kuala Lumpur to Hong Kong on Cathay Pacific Airways Flight Number CX722. The shipper for this export from Malaysia was listed as Malaysian Transshipment Company 2 and the consignee was listed as the Chinese Purchaser.

*Defendant Procured Over 100 Export-Controlled Servers from U.S. Manufacturer 3*

45. On July 2, 2024, defendant caused a purchase order to be submitted by a U.S. Front Company to U.S. Manufacturer 3 for 100 export-controlled servers each containing Nvidia's H100 GPU for over 22 million dollars.

46. Defendant instructed a representative of the U.S. Front Company to represent that the buyer of the export-controlled servers was Topmost and that they would be sent to Malaysian Transshipment Company 2.

47. In orchestrating this deal, defendant submitted fraudulent documentation from Topmost indicating that an individual named Jackie Lui was the Chief Executive Officer of the company. In 2021, defendant purchased the identifying documents of an individual whose identity is known to the grand jury and used this identity to conduct business transactions in furtherance of the export evasion scheme.

COUNT ONE

[50 U.S.C. § 4819(a) and (b); 15 C.F.R. §§ 736.2(b)(1), 764.2, and Part 774, Supp. No. 1]

48. The Grand Jury incorporates and realleges the allegations set forth in paragraphs One through Forty-Five above, as if fully set forth herein.

A. OBJECT OF THE CONSPIRACY

49. Beginning on an unknown date but no later than in or around October 2023, and continuing until at least August 12, 2026, in Los Angeles County, within the Central District of California, and elsewhere, defendant Greg Lui, and others known and unknown, knowingly and willfully conspired to export and cause to be exported from the United States to the People's Republic of China various items subject to the Export Administration Regulations and on the Commerce Control List, including graphics processing units and servers, without having first obtained a license from the United States Department of Commerce, in violation of Title 50, United States Code, Section 4819 and Title 15, Code of Federal Regulations, Sections 736.2, 764.2, and Part 774, Supplement Number 1.

B. MANNER AND MEANS OF THE CONSPIRACY

50. The object of the conspiracy was to be accomplished in substance as follows:

a. Defendant and his co-conspirators provided documentation to the U.S. Manufacturers that misrepresented the items would be going to permissible end users and end destinations that did not require an export license. However, these end users and end destinations were not the true end users and end destinations. Instead, defendant and his co-conspirators conspired to send the export-controlled items to

China (including Hong Kong) without obtaining the required export licenses.

b. Defendant and his co-conspirators used Earthmade to purchase and send export-controlled items to China without the required licenses, by making and causing to be made false statements, material misrepresentations, and omissions in EEI filings and related financial, shipping, and end-user related documents and records to conceal the nature of the illicit exports. Among other things, defendant and his co-conspirators caused fraudulent classification designations to be listed in EEI filings to conceal that they were, in fact, illegally shipping export-controlled technology to China.

c. Defendant and his co-conspirators used Earthmade to ship export-controlled items to countries, like Malaysia and Singapore, where no license was required for items classified as ECCN 4A0990.a, 5A002.z, and/or 5A992.z. Defendant and his co-conspirators then illegally re-exported or caused the re-export of those controlled items to China, for which a license was required.

COUNT TWO

[18 U.S.C. § 554; 18 U.S.C. §§ 2(a), (b)]

51. The allegations set forth in paragraphs One through Forty-Five of this indictment are incorporated as if fully set forth herein.

52. From in or around October 2023, and continuing until at least August 12, 2026, in Los Angeles County, within the Central District of California, and elsewhere, defendant knowingly and fraudulently did, and attempted to, and willfully caused others to, receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of merchandise, articles, and objects, and aided, abetted, counseled, commanded, induced, and procured others to do the same, all prior to the exportation of the merchandise, articles, and objects, and all the while knowing that the merchandise, articles, and objects were intended for the exportation contrary to a law and regulation of the United States.

53. Specifically, defendant did and attempted to buy and arrange for the shipment of servers containing NVIDIA A100 GPUs and H100 GPUs, and did and aided and abetted, counseled, commanded, induced, and procured others to do so, all the while knowing that these items would be exported from the United States contrary to the law and regulations of the United States because defendant had not applied for or obtained the necessary export license for each such items.

COUNT THREE

[18 U.S.C. § 1956(h)]

54. The allegations set forth in paragraphs One through Forty-Five of this indictment are incorporated as if fully set forth herein.

A. OBJECT OF THE CONSPIRACY

55. Beginning on an unknown date, but no later than February 28, 2024, and continuing through at least in or around December 13, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant and others known and unknown to the Grand Jury, did knowingly conspire and agree to conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, knowing that the property involved in the financial transactions represented the proceeds of unlawful activity, which, in fact, involved the proceeds of a specified unlawful activity, that is, outbound smuggling, committed in violation of Title 18, United States Code, Section 554, with the intent to promote the carrying on of that specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

B. THE MANNER AND MEANS OF THE CONSPIRACY

56. The object of the conspiracy was to be accomplished, in substance, as follows:

a. Defendant would open a bank account ending in 4441 with Bank of America (the "4441 Account") in Los Angeles County, to operate Earthmade's smuggling business.

b. Defendant would open a bank account ending in 3503 with JP Morgan Chase (the "3503 Account") in Los Angeles County, to operate Earthmade's smuggling business.

c. Defendant would receive payments from Unindicted Co-Conspirator 1, in Malaysia, into the 4441 and 3503 Accounts for the purchase of export-controlled servers.

d. Defendant would use the money sent to the 4441 and 3503 Accounts to purchase export-controlled severs from U.S. Manufacturers 1, 2, and 3.

FORFEITURE ALLEGATION ONE

[50 U.S.C. § 4819(d)(1); 18 U.S.C. § 981(a)(1)(C); and 28 U.S.C. § 2461(c)]

2. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 50, United States Code, Section 4819(d)(1); Title 18, United States Code, Section 981(a)(1)(C); and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offense set forth in Count One of this Indictment.

3. The defendant, if so convicted shall forfeit to the United States of America the following:

(a) all right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses; and

(b) all right, title, and interest in any and all property used or intended to be used, in any manner, to commit or facilitate the violation;

(c) all right, title, and interest in property constituting an item or technology that is exported or intended to be exported in violation of Title 50, United States Code, Chapter 58, Subchapter I; and

(d) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a), (b), and (c).

4. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the

value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 981(a)(1)(C); and 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offense set forth in Count Two of this Indictment.

2. The defendant, if so convicted, shall forfeit to the United States of America the following:

(a) all right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been

//

//

placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 982]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1), in the event of the defendant's conviction of the offense set forth in Count Three of this Indictment.

2. The defendant, if so convicted, shall forfeit to the United States of America the following:

(a) Any property, real or personal, involved in such offense, and any property traceable to such property; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), the defendant, if so convicted, shall forfeit substitute property, if, by any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty. Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the

course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000.00 or more in any twelve-month period.

A TRUE BILL

/S/
Foreperson

TODD BLANCHE
Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

COLIN S. SCOTT
Assistant United States Attorney
National Security Division

JOSEPH GUZMAN
Assistant United States Attorney
National Security Division